IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
June 20, 2018 Session

## EMERGENCY MEDICAL CARE FACILITIES P.C. v. BLUECROSS BLUESHIELD OF TENNESSEE INC. ET AL.

**Appeal from the Circuit Court for Madison County**
**No. C-14-208      Donald H. Allen, Judge**

_____

### No. W2017-02211-COA-R3-CV
_____

This interlocutory appeal pursuant to Tennessee Code Annotated section 27-1-125 follows the trial court's denial of a motion for class action certification. The proposed class consists of various physicians and health care professionals who are participating providers in the Defendants' insurance networks and who provide medical services in the emergency departments of hospitals. The central contention is that the class members' contracts with the Defendants were breached when the fee for certain services was capped at a $50.00 rate. The trial court ultimately concluded that certification of the class was improper and held, among other things, that the plaintiff had not demonstrated that common issues in the case predominated over individual ones. For the reasons stated in this Opinion, we affirm the trial court's denial of class certification.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the court, in which, KENNY ARMSTRONG, J., joined and D. MICHAEL SWINEY, C.J., filed a separate dissenting opinion.

L. Gino Marchetti, Jr. and Keith W. Blair, Nashville, Tennessee, and Seth A. Goldberg and, Joseph J. Pangaro, Philadelphia, Pennsylvania, for the appellant, Emergency Medical Care Facilities, PC.

Gary C. Shockley, and Caldwell G. Collins, Nashville, Tennessee, and Charles H. Barnett, III, Jackson, Tennessee for the appellees, BlueCross BlueShield of Tennessee, Inc., and Volunteer State Health Plan, Inc..

## OPINION

## BACKGROUND AND PROCEDURAL HISTORY

This proposed class action suit was filed by Emergency Medical Care Facilities, P.C. ("EMCF") against BlueCross BlueShield of Tennessee, Inc. ("BlueCross") and Volunteer State Health Plan, Inc. ("VSHP").[1] EMCF, a professional corporation comprised of physicians and other health care professionals, provides medical services in Tennessee emergency departments. Defendant BlueCross is a health insurance company that provides and underwrites health insurance, and its subsidiary, VSHP, is a licensed health maintenance organization that has served as a managed care organization for TennCare and as an administrative services organization for TennCare *Select*. The TennCare and TennCare *Select* programs are distinct, and regarding the former, VSHP's managed care contract is "at-risk," in the sense that the State pays VSHP a fixed per-member, per-month capitation payment.

EMCF is a participating provider in the Defendants' TennCare and TennCare *Select* networks, and the parties' contractual relationship is governed by a number of documents, including the "Group Practice Agreement," the "BlueCare Attachment,"[2] and the "TennCare *Select* Amendment." There does not appear to be any dispute that such form agreements are used for all of the Defendants' network providers who treat TennCare and TennCare *Select* patients, including those of the proposed class. Although the BlueCare Attachment and TennCare *Select* Amendment state that EMCF shall be compensated for services at the lessor of the applicable fee schedules or billed charges, the Group Practice Agreement and BlueCare Attachment contain language indicating that changes to state or federal laws and regulations shall automatically be incorporated by reference as they become effective. Under the TennCare *Select* Amendment, TennCare reserves the right to set compensation with regards to TennCare *Select* members.

The present controversy stems from a dispute over payment for services provided in hospital emergency departments. Starting in July 2011, VSHP began to cap reimbursement to EMCF for purported non-emergency services delivered in the emergency department at $50.00. VSHP maintains that this payment was required by a change in state law, which directed reimbursement for non-emergency services to be capped.[3] In implementing the change, VSHP relied upon a patient's diagnostic codes as

---

[1] Although the original class action complaint named only BlueCross as a defendant, the amended complaint also named VSHP.

[2] VSHP's TennCare product is known as BlueCare.

[3] The change in payment was evidently prompted by fiscal concerns. According to the Defendants' brief, due to an anticipated reduction in federal funding, the Bureau of TennCare proposed that the payment for non-emergency services be limited in order to save millions of dollars and

assigned by the provider of medical services in the emergency department in order to determine whether the services were for non-emergency services and thus subject to the $50.00 cap. Subsequent to the change in payments, in June 2012, the BlueCare Provider Administration Manual was amended to reflect the existence and potential application of the $50.00 cap. There is no dispute that the BlueCare Provider Administration Manual is an incorporated part of the parties' contractual obligations.

Being of the opinion that reimbursement at the $50.00 cap constituted a breach of its contract, EMCF filed a class action complaint in the Madison County Circuit Court in August 2014, asserting that it and other similarly situated class members had been paid "less than the contractually mandated amount for the emergency medical services rendered." As set forth in its amended complaint, filed January 7, 2015, EMCF sought to represent a class "of all physicians and other health care professionals who are licensed in the State of Tennessee and who entered into a contract with [the Defendants] whereby they were to provide, and did provide, emergency medical services to BlueCare or TennCare Select enrollees from the period of July 1, 2011 to the present." According to EMCF, a common issue in the case included whether the class members' provider contracts were breached by way of the Defendants' imposition of the $50.00 cap regarding certain services.

Although the amended complaint acknowledged that the Defendants had taken the position that the implementation of the $50.00 cap was required as a result of a change in state law, EMCF alleged that "any such purported change in state law is preempted by federal law" and was inconsistent with other Tennessee law. The Defendants subsequently removed the case to federal court in light of EMCF's apparent reliance on federal law.

Following the case's removal to federal court, on June 29, 2015, the Defendants filed an answer. Within their answer, the Defendants admitted that VSHP began to reimburse EMCF at a $50.00 cap for non-emergency services beginning on July 1, 2011. In defense of this practice, however, the Defendants asserted that such reimbursement changes "were mandated by Tennessee law, were directed and approved by the Bureau of TennCare, and were in accordance with the parties' contract." Moreover, the Defendants argued that EMCF should be estopped and had waived the opportunity to seek additional reimbursement given its previous failure to act in response to multiple notices about the reimbursement changes. Eventually, by order entered on January 19, 2017, the federal district court remanded the case back to the Madison County Circuit Court, being of the opinion that it lacked subject matter jurisdiction.

---

discourage abuse of the emergency department by members using hospital emergency departments for non-emergency services.

Following the remand of the case to state court, on July 28, 2017, EMCF moved the Circuit Court for class certification. In support of its contention that certification was appropriate under Rules 23.01 and 23.02 of the Tennessee Rules of Civil Procedure, EMCF argued as follows:

> [This case] involves *hundreds* of healthcare provider groups and *thousands* of individual health care providers whose reimbursement for emergency medical services provided to enrollees in Defendants' health plans or health plans administered by Defendants has been improperly reduced based on a fee-capping policy (the "Fee-Capping Policy") that Defendants have implemented in the exact same way with respect to Plaintiff and each proposed class member – by capping the reimbursement of all of their claims for certain emergency medical services at $50.00.
>
> Whether Defendants' implementation of that policy constituted a breach of the contracts Defendants had or have with Plaintiff and each proposed class member is a question that is common to the Plaintiff and each member of the proposed class because all of them entered into virtually identical form contracts with Defendant that required Defendant to reimburse them pursuant to an agreed upon fee schedule, not at the reduced rates Defendants unilaterally imposed under the Fee-Capping Policy. Their damages are simply the difference between the contractually established rates for the claims that were subject to the Fee-Capping Policy and the $50.00 capped-fee imposed thereunder.

The Defendants vigorously opposed EMCF's request for class certification. Following a hearing, the Circuit Court entered an order on November 2, 2017, denying EMCF's motion for class certification. In addition to holding that common issues in the case did not predominate over individual ones, the Circuit Court concluded that EMCF had failed to prove that the class action was a superior method of adjudicating this dispute. Following the denial of its motion for class certification, EMCF timely sought interlocutory review in this Court pursuant to Tennessee Code Annotated section 27-1-125.

## ISSUES PRESENTED

EMCF presents several issues on appeal, all of which relate to the denial of its motion for class certification. In addition to contending that it has a class-wide method of calculating damages, EMCF generally asserts that the trial court erred in its analysis regarding predominance and superiority. Through this appeal, we review whether the trial court's denial of class certification was proper.

**STANDARD OF REVIEW**

The determination of whether an action should proceed as a class action is left to the trial court's discretion. *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 308 (Tenn. 2008) (citation omitted). As such, the trial court's decision on class certification will stand absent abuse of that discretion. *Roberts v. McNeill*, No. W2010-01000-COA-R9-CV, 2011 WL 662648, at *3 (Tenn. Ct. App. Feb. 23, 2011) (citation omitted). "If reasonable judicial minds could differ as to the decision's soundness, the decision must stand." *Freeman v. Blue Ridge Paper Prods., Inc.*, 229 S.W.3d 694, 703 (Tenn. Ct. App. 2007) (citing *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999)).

The discretionary nature of the issue notwithstanding, it is well-settled that the abuse of discretion standard does not immunize a trial court's decision from any meaningful appellate scrutiny. *See Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) (citation omitted). As we have previously explained:

> A trial court's discretion is not unbounded. A trial court must consider controlling legal principles and relevant facts when making a discretionary decision. A trial court abuses its discretion if it (1) applies an incorrect legal standard, (2) reaches an illogical or unreasonable decision, or (3) bases its decision on a clearly erroneous evaluation of the evidence. Additionally, a trial court abuses its discretion if it "strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision."

> Appellate courts review a trial court's discretionary decision to determine "(1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions." We review the trial court's legal conclusions *de novo* with no presumption of correctness. We review the trial court's factual conclusions under the preponderance of the evidence standard.

*Roberts*, 2011 WL 662648, at *3–4 (internal citations omitted).

**DISCUSSION**

**Standards governing class certification**

There is no guaranteed right to class action status in this state. *See First Am. Nat'l Bank of Nashville v. Hunter*, 581 S.W.2d 655, 659 (Tenn. Ct. App. 1978) ("[T]he prosecution of a class action is not a matter of right which may be demanded."). Class action certification is governed by Rule 23 of the Tennessee Rules of Civil Procedure,[4] and it is clear that the proponent of class certification bears the burden to demonstrate that certification is appropriate under that rule. *Roberts*, 2011 WL 662648, at *4 (citation omitted). The burden is two-fold. *Id.* First, the proponent must satisfy the prerequisites outlined in Rule 23.01. *Id.* (citation omitted). Rule 23.01 permits certification when

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interest of the class.

Tenn. R. Civ. P. 23.01. Second, the proponent of class certification must establish that the class action is maintainable under Rule 23.02. *Roberts*, 2011 WL 662648, at *4 (citation omitted). "In contrast to Rule 23.01, the proponent of class certification must establish only one Rule 23.02 basis for the maintenance of a class action." *Id.* (citation omitted). At issue is subsection (3) of Rule 23.02, which is satisfied when "the court finds that the question of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Tenn. R. Civ. P. 23.02(3).

As this Court has previously noted, the United States Supreme Court has recognized that because of important due process concerns implicated by the certification decision, federal trial courts must conduct a "rigorous analysis" of Rule 23 requirements before certifying a class. *Bloodworth*, 2007 WL 1966022, at *6 (citing *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). So too must the trial courts of this state. *See Highlands Physicians, Inc. v. Wellmont Health Sys.*, No. E2017-01549-COA-R3-CV, 2017 WL 6623992, at *5 (Tenn. Ct. App. Dec. 28, 2017) ("When making a determination regarding whether to certify a class, a trial court must undertake a 'rigorous analysis' of the aforementioned requirements of Rule 23."); *Bloodworth*, 2007 WL 1966022, at *7 ("[W]e find no basis for exempting Tennessee trial courts from the requirement that they conduct a rigorous, thorough, and careful analysis of the issues related to the standards in

---

[4] Although Rule 23 of the Tennessee Rules of Civil Procedure governs class certification in the courts of this state, we consult the decisions of federal courts on class certification as persuasive authority, as the "federal courts have frequently dealt with the issues surrounding class certification under the federal rule, which is substantially the same as the state rule." *Gov't Emps. Ins. Co. v. Bloodworth*, No. M2003-02986-COA-R10-CV, 2007 WL 1966022, at *2 (Tenn. Ct. App. June 29, 2007) (citation omitted); *see also Bayberry Assocs. v. Jones*, 783 S.W.2d 553, 557 (Tenn. 1990) (noting that "the opinions of federal courts are persuasive authority" in the context of Rule 23).

Tenn. R. Civ. P. 23 before certifying a class action."). Simply put, a "trial court is required to take a 'close look' at the parties' claims and evidence" and has a "duty to rigorously apply Rule 23's requirements and to ensure that those requirements are met." *Bloodworth*, 2007 WL 1966022, at *6 (citations omitted). "[M]ost courts have held that where such an analysis is not performed by the trial court, or where the record does not clearly reflect such an analysis, the certification decision must be overturned, just as it must if the order reflects the application of incorrect standards." *Id.* at *8 (citations omitted).

Again, courts should be careful to ensure that the requirements of Rule 23 are met before granting certification due to the significant consequences that can follow from the certification decision. *Id.* at *11. In addition to the fact that absent class members may be bound by the judgment, a defendant may be forced into settlement by the mere entry of a certification order. *Id.* (citations omitted). Although it is true that a previously certified class may later be decertified during the course of a lawsuit, this fact does not weaken the requirements of Rule 23 and "does not relieve the trial court of its duty to ensure from the outset that all the requirements for certification have been met." *Id.* at *12. Accordingly, a "certify now and worry later" attitude must be discarded. *See id.* at *13 ("[M]ost courts have rejected the approach of 'certify now and worry later.'"). Indeed, a cautious approach to class certification is essential. *Id.* (citations omitted).

The extent of the rigorous analysis necessary for a class certification decision will inevitably vary in a given case and will "depend upon the claims and defenses presented, the type of class certification requested, the issues raised regarding the compliance with [Rule 23's] requirements, the members of the purported class, and other questions presented by the particular case and the requirements of Rule 23." *Id.* at *14. Importantly, "a court considering class certification need not assume that all well-plead facts are true, but instead must probe behind the pleadings to consider facts in evaluating whether the party moving for certification has met its burden." *Id.* at *19 (citations omitted). Although there previously existed a judicial reticence to examine issues related to the merits at the class certification stage, even when those issues also related to class certification requirements, *see id.* at *20, things have largely changed with regard to this concern. It is now understood that a trial court should make whatever factual and legal inquiries are necessary to performing an analysis of the class certification requirements, irrespective of whether there is an overlap with the "merits." *See id.* at *21-22 (citations omitted); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) ("Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped."); *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676 (7th Cir. 2001) ("[I]f some of the considerations under Rule 23(b)(3) . . . overlap the merits . . . then the judge must make a preliminary inquiry into the merits."). As part of its "rigorous analysis," the trial court must consider what the parties must prove. *Bloodworth*, 2007 WL 1966022, at *22 (citation omitted).

## Rule 23.02(3): Predominance and Superiority

In this case, the trial court denied EMCF's request for class certification upon determining that the predominance and superiority requirements of Rule 23.02(3) had not been satisfied. As explained below, because we find no error in the trial court's conclusion that predominance of common issues is lacking in this case, we affirm its denial of class certification.

### *Predominance*

In order to satisfy Rule 23.02(3), the trial court must, in part, find "that the question of law or fact common to the members of the class predominate over any questions affecting only individual members." Tenn. R. Civ. P. 23.02(3). "This requirement 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Walker*, 249 S.W.3d at 311 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). Of course, the language of the requirement "requires more than the mere existence of common questions of fact or law." *Bloodworth*, 2007 WL 1966022, at *14. What is required is that common issues be unencumbered by any individual issues in the action. *Id.* (citation omitted).

> Common questions of fact and law predominate if they have "a direct impact on every class member's effort to establish liability and on every class member's entitlement to ... relief." An issue of law or fact should be considered common "only to the extent its resolution will advance the litigation of the case." The predominance inquiry, therefore, must include consideration of each element of the cause of action asserted and the facts necessary to prove each.

> A claim will satisfy the predominance requirement only "when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position." Consequently, courts should not certify common question classes if most or all of the class members' claims depend on the resolution of individual questions of fact. With regard to questions of fact, an issue is common to the class when it is susceptible to generalized, classwide proof.

> Where the elements of the subject claims can only be established after "considerable individual inquiry," predominance does not exist. Predominance can be found only when "there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, because such proof obviates the need to examine each class member's individual position."

- 8 -

Where claims of the proposed class vary so greatly that evidence must be taken on each claim or at least on numerous types of claims, certification is not appropriate. The determination of whether common questions predominate depends on whether the class members will require individualized hearings to prove the elements of the cause(s) of action involved in the lawsuit.

Where an element of the cause of action requires individualized inquiry, certification of a class of plaintiffs is generally precluded because individual questions of law or fact will predominate.

When the resolution of a common legal issue is dependent on factual determinations that will differ among the proposed class members, courts have consistently refused to certify a class action. As a general rule, "certification is improper if the merits of the claim [depend] on the defendant's individual dealings with each plaintiff."

Assertion of a common legal theory for recovery by a proposed class does not establish either typicality or predominance when proof of the cause of action asserted requires individualized inquiry.

Neither, necessarily, does a common course of conduct by the defendant. There must be more than "a mere nucleus of facts in common," because the course of conduct or common facts must be relevant to proof of the elements of the cause of action alleged.

. . . .

In order to determine whether common questions predominate, a court must examine the cause of action asserted on behalf of the proposed class. After identifying the relevant legal and factual questions, the predominance inquiry requires a determination that common issues of law or fact exist and, then, a determination that such common issues predominate. That inquiry must focus on the relationship between common and individual issues. "Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action."

The predominance inquiry is critical because class action status should not be conferred on cases that "would degenerate in practice into multiple lawsuits separately tried." Thus, even where some common issues exist, if "after adjudication of the classwide issues, plaintiff must still introduce a great deal of individualized proof or argue a number of

individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification" under the predominance requirement for common question classes. The presence of remaining multiple individual questions, even if some common questions can be determined on a class wide basis, affects the manageability of the class action, a key component of the superiority requirement.

*Id.* at \*14–17 (internal citations and footnotes omitted).

In asserting its breach of contract claim in the amended complaint, EMCF contended that its contract with Defendants had been breached when certain services were capped at a flat rate of $50.00. According to EMCF, these $50.00 payments did not comport with the compensation owed as a part of the parties' contractual obligations. The issue of the $50.00 payments also served as an alleged basis for class action relief, as EMCF posited as a common question whether the proposed class members' contracts were breached when those members were reimbursed at a flat rate of $50.00 per service.

In this case, there does not appear to be any dispute that there are contractual provisions stating that compensation for services shall be at the lessor of the applicable fee schedules or billed charges. Of course, these provisions notwithstanding, there is a dispute as to whether compensation should always be in accordance with such terms. Defendants maintain that they are contractually permitted, via incorporation of state law, to cap non-emergency services at $50.00. Thus, as we understand it, under the Defendants' view of their contractual obligations, a $50.00 cap could be applied irrespective of what payment would be owed to EMCF and other proposed class members under the general fee schedules if a change in state law requiring such a cap for non-emergency services in the emergency room was incorporated into the parties' contract. Moreover, it is clear to us that some claims of the proposed class were potentially subject to a $50.00 cap regardless of the existence of a state law providing for same.

In holding that this case was not proper for class action treatment, the trial court found that a number of facts precluded a predominance of common issues. First, the trial court broached the question concerning the existence of a law providing for the disputed $50.00 cap, albeit in a somewhat roundabout way. Rather than directly making a preliminary inquiry into the question of whether a $50.00 cap provision was contractually incorporated due to a change in state law, the trial court essentially assumed such a provision was operative, tying this understanding to an apparent concession made by EMCF. Because the trial court found that EMCF had essentially conceded that the application of a $50.00 cap was within the Defendants' rights, the trial court reasoned that individualized proof would be necessary to establish a contractual breach. In pertinent part, the trial court's order noted that EMCF had "acknowledged that the reduction in payments . . . was a requirement of state law." Moreover, the trial court's

order stated that the federal district court judge had "recognized that EMCF did not contest BCBST's right to pay the challenged $50 flat fee for **non-emergency** services." According to the trial court, therefore, "proof of nonperformance and of damages as an element of liability would require individualized consideration of the claims of all 275 putative class members."

The trial court also reasoned that predominance of common issues was precluded based on issues of waiver, estoppel, and the amendment of the BlueCare Provider Administration Manual. These issues, the court held, raised concerns that mandated individualized consideration among the proposed class. Further, the trial court noted that inasmuch as the State reserved the right to set compensation with regard to proposed class members who participate in TennCare *Select*, those class members "present[ed] a distinct set of legal and factual issues from the BlueCare providers in the class."

Although EMCF takes umbrage at the trial court's findings regarding predominance, we find no error with the trial court's ultimate conclusion. Without a doubt, there is a common thread among the claims of the proposed class inasmuch as it is alleged that each of the submitted claims regarding alleged emergency medical services provided by class members in hospital emergency rooms was reimbursed at the $50.00 cap. This commonality aside, it is clear that not all claims are governed by the same contractual provisions. Indeed, although the record suggests that form agreements are used for all of the Defendants' network providers who treat TennCare and TennCare *Select* patients, the record also reveals that the particular claims at issue in this case are not subject to the same contractual terms on a classwide basis. First, even though both the TennCare and TennCare *Select* programs are similar from the standpoint that they generally tie compensation to the lessor of applicable fee schedules or billed charges, the trial court correctly observed that the TennCare *Select* Amendment implicates different legal issues for TennCare *Select* providers inasmuch as the State also reserves the right to set compensation. Moreover, even if we assume that EMCF is correct in its position that no state law was ever passed regarding the $50.00 cap, thus allowing it to prove the general invalidity of applying a cap to certain TennCare claims, other TennCare claims must be judged by different contractual standards. Indeed, as we have previously noted, there is no dispute that the BlueCare Provider Administration Manual is an incorporated part of the parties' contractual obligations, and in June 2012, the manual was amended to reflect the existence of the $50.00 cap. The record further reflects that numerous providers entered into contracts in the Defendants' networks after the amendment of the manual, which specifically provided that "Emergency Department (ED) Non-Emergency Professional fees are based on contracted rate with reimbursement not to exceed $50.00." Although EMCF may insist that no state law ever provided for a $50.00 cap, a $50.00 cap provision was nevertheless clearly an operative contractual term applicable to many of the potential class members and/or claims at issue in this case after the amendment of the manual.

In our view, the above fact is not without significant consequences. In its appellate briefing, EMCF has suggested that differences regarding individual claims might be managed through the use of subclasses. For instance, in its reply brief, EMCF argues that, "were the court to accept that . . . TennCare Select claims were significantly different from BlueCare claims, it is within the court's discretion to create subclasses to aid in case management." Respectfully, having carefully reflected on the issue, we are of the opinion that subclassing could not permissibly be the salve EMCF might desire it to be. Although Rule 23 does provide that a "class may be divided into subclasses," Tenn. R. Civ. P. 23.03(4), it is clear that "each subclass must independently satisfy the requisite certification requirements." *McNeill*, 2011 WL 662648, at *9 (citations omitted). In this case, there is inevitably a barrier to such a conclusion. Even if there is a subset of claims for which there is no operative contractual cap provision,[5] thus allowing for proof that the application of such a cap would have been equally invalid as to any of those claims, other claims clearly were subject to a potential $50.00 cap as explained previously. Indeed, as we have noted, many providers entered into contracts after the BlueCare Provider Administration Manual was amended, and the manual, which is an incorporated part of the parties' contractual obligations, had been amended to reflect the existence and potential application of the $50.00 cap. As to these "later" claims for which "Emergency Department (ED) Non-Emergency Professional fees are based on contracted rate with reimbursement not to exceed $50.00," the invalidity of a $50.00 capped payment in a given case would be dependent on whether or not a factual predicate existed for the capped payment. In other words, under that specific contractual universe, did the submitted claim in fact involve a non-emergency so as to permit the cap, or did it involve an emergency to which the cap does not apply? Having to answer these types of questions would invite a level of individualized consideration that is not amenable to class action proceedings. Therefore, even if subclasses were created to differentiate the class along lines of the varying contractual standards that governed given claims,[6] it is clear to us that the proof required to prove a breach with respect to the claims governed under the amended manual would be individualized. This, therefore, signifies that common issues do not predominate regarding such claims. *See Bloodworth*, 2007 WL

---

[5] We are of the opinion that this remains an open question notwithstanding the Defendants' arguments that the point has been conceded by EMCF. If there were not (a) certain claims that were subject to potential application of the $50.00 cap by virtue of the amendment to the BlueCare Provider Administration Manual and (b) other issues defeating predominance, it likely would have been necessary for the trial court to specifically address whether a state law providing for the disputed $50.00 cap exists in order to rule on certification. *See infra*. However, inasmuch as a predominance of common issues is not established in view of the discussion herein regarding the proposed class, there is no need to remand the case for the trial court to preliminarily inquire into that issue for purposes of a certification ruling.

[6] Assuming the $50.00 cap was incorporated contractually by virtue of a state law, there of course would not be different payment terms between earlier and later TennCare claims. However, such a circumstance would only deepen the absence of predominance in this case; as we have explained, the proof required to establish that a $50.00 capped payment was a breach would be factually dependent on establishing that the submitted medical claim involved an emergency, as opposed to a non-emergency.

- 12 -

1966022, at *15 (citation omitted) ("Where the elements of the subject claims can only be established after 'considerable individual inquiry,' predominance does not exist.").

On appeal, EMCF argues vehemently against the notion that an individualized consideration of liability would ever be potentially necessary in this case. In its reply brief, for instance, EMCF argues that the Defendants "performed the only individual analysis that will ever be necessary" by processing the claims at issue. EMCF notes that by processing the subject claims, the Defendants already established that the claims were for covered, medically necessary services. We agree with the Defendants that EMCF's argument on this point is "fallacious." Just because a claim was processed and thus determined to be for a covered and medically necessary service, that does not establish that the claim necessarily involved an emergency. We agree with the Defendants that such a link is absent, at least as gleaned from the record before us. Indeed, Dr. Robert Turner, who is President of EMCF, stated in his deposition that some who present in the emergency room are not suffering from a medical emergency but that "[s]ervices are all billed the same." He also indicated that in order to determine and investigate whether a particular patient had a medical emergency, one would need to go back and look at the individual patient's medical record to do that. Despite EMCF's emphasis on the fact that all claims have been processed, we fail to see how this fact necessarily demonstrates the character of the claims, i.e., whether or not they involved an emergency. Therefore, given that some claims are subject to contractual terms that allow for a $50.00 cap to attach to non-emergencies, there is the anticipated prospect that the process necessary to resolve these claims will degenerate into multiple separate individualized inquiries.

Although EMCF also suggests that it is "not necessary to determine whether each individual claim was for an emergency" and reasons that the general fee schedules should determine payment, following this path assumes that no contractual basis for a cap regarding non-emergencies exists. Although *some* claims *might* not have been subject to the potential application of a cap if the disputed state law does not exist, the record reflects that some were. Again, as to those claims that were subject to the potential application of the $50.00 cap, it inevitably follows that one cannot determine that the application of a flat $50.00 cap concerning a claim was invalid unless one proves that the claim at issue involved an emergency. The amendment of the BlueCare Provider Administration Manual, therefore, does create an issue mandating individualized consideration.

In its brief on appeal, EMCF argues at some length that, even if there was an operative $50.00 cap,[7] the application of the cap by the Defendants was improper because the $50.00 capped payments were applied due to final diagnostic codes accompanying the submitted claims. According to EMCF, federal regulations do not allow managed

---

[7] The point is specifically made in connection with an alternative argument that the cap was, and is, operative, because of a change in law.

care organizations to limit what constitutes an emergency based on final diagnosis, and as such, it reasons that application of a non-emergency fee on the basis of final diagnostic codes is improper.[8] It further contends that federal law, as well as the parties' contracts, "provides that the determination of whether a condition is an emergency medical condition is made at the time the patient presents at the emergency department, because the definition focuses on a patient's symptoms." In our view, advancing the argument that diagnostic codes cannot be the standard upon which an emergency is determined for purposes of payment does not somehow make common issues predominate regarding the claims for which a $50.00 cap provision is operative. Indeed, the argument would not, even if true, lend itself to establishing that there was an across-the-board contractual breach. A breach with regards to payment would be established by showing that the Defendants did not pay class members the full amounts to which they were entitled. As it is, for those claims where a $50.00 cap provision is operative, class members seeking to prove a breach and establish liability would need to prove that their respective claims did, in fact, constitute an emergency; after all, given a contractual basis for a cap regarding non-emergencies, reimbursement at a $50.00 capped payment could be factually justified. Ultimate resolution of the question, of course, would necessitate an individualized inquiry, as has already been suggested. Depending on the facts surrounding the patient, a given claim may or may not meet the standard of an emergency under the contract, which according to EMCF, involves an assessment of the patient's symptoms at the time of presentment. The Defendants' application of a $50.00 capped payment can thus only be determined to be a contractual breach if a given claim was, in fact, an emergency under that standard. To the extent that EMCF argues against the necessity of such an inquiry based upon the processing of the subject claims, we reiterate that the mere fact that the Defendants determined claims to be for medically necessary services does not establish whether or not such services involved an emergency.

For those earlier TennCare claims not governed by the amendment to the manual, the contractual basis for a $50.00 cap is tied only to the existence of a state law providing for the cap. We do not question that resolution of the Defendants' liability for those particular claims could potentially be determined in an across-the-board basis, at least irrespective of any affirmative defenses. Specifically, we understand how such a subset of claims could be established on a prima facie basis without application of

---

[8] The Defendants submit that such an argument is misplaced and contend that the federal regulation relied upon by EMCF does not govern the rate of payment. In pertinent part, the Defendants argue in their appellate brief that the "section [relied upon] requires a managed care organization to 'cover' and 'pay' for emergency services, not to cover and pay *at the same rate* for all services. . . . The preamble to the final rule recognizes this key distinction." In other words, the Defendants appear to argue that while the federal regulation relied upon may prohibit coverage determinations based on diagnostic codes, it does not speak to the amount of payment that can be made after treatment has been completed. In developing their position in one of their federal court filings, the Defendants argued as follows: "Nowhere does the regulation address the **amount** of payment for such services, nor the amount or procedure for payment for **nonemergency** services[.]" (emphasis in original).

individualized proof. Indeed, if there was no incorporated provision of state law providing for a $50.00 cap, then application of such a non-existent payment term would be equally invalid as to all providers who had TennCare claims within this subset of the class.[9] On the other hand, if a contractual basis existed for applying a $50.00 cap through the incorporation of state law, inevitably the invalidity of a $50.00 capped payment in a given case would be dependent on whether or not a factual predicate existed for the capped payment. Of course, this latter scenario would implicate individualized concerns. Inasmuch as the existence of the disputed state law affects the nature of the proof that would be required to establish liability for the above-referenced subset of claims, it is a question that bears on the predominance of common issues of such claims. *See Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1237 (11th Cir. 2016) (noting that a question bears on predominance "if, answered one way, an element or defense will require individual proof but, answered another way, the element or defense can be proved on a classwide basis").

As previously discussed, incident to its conclusion that individualized proof would be necessary to establish contractual breaches in this case, the trial court basically assumed that the disputed provision of state law was operative, doing so on the basis of an apparent concession by EMCF. On appeal, EMCF has taken issue with the trial court's findings in this regard on a couple of levels. First, with respect to its "so-called concession," EMCF notes that the issue of whether the $50.00 fee cap was a law is, in fact, "hotly disputed." Second, EMCF argues that the trial court erred by resolving a merits issue pertaining to the existence of a change in state law providing for the $50.00 cap.

We agree with EMCF's position that it has not conceded the issue of whether a state law providing for the $50.00 cap exists. Throughout this litigation, the Defendants have frequently offered arguments that EMCF made definitive concessions about the right of the Defendants to contractually apply a $50.00 cap for non-emergency services. In their appellate brief, for instance, the Defendants state as follows: "[T]he parties' contract would require payment of the full rate only for an emergency medical condition and EMCF concedes that Tennessee law requires a flat $50 fee for services that do not meet that standard." The trial court's order denying certification found favor in this general argument, accepting as fact that "EMCF did not contest BCBST's right to pay the challenged $50 flat fee for **non-emergency** services."

---

[9] It would not be dispositive that individual issues of damages would remain. *Meighan v. U.S. Sprint Comm'cns Co.*, 924 S.W.2d 632, 637 (Tenn. 1996) (citation omitted) ("It is well established that the existence of separate issues of law and fact, particularly regarding damages, do not negate class action certification."). *See also Rodney v. Nw. Airlines, Inc.*, 146 F. App'x 783, 791 (6th Cir. 2005) (citation omitted) ("A plaintiff need not calculate a specific damage figure so long as he proposes an acceptable method for calculating damages.").

It is true that, included among the morass of filings in the record, there are a few passing references where EMCF appears to acknowledge that the disputed provision of state law governs the parties' contractual rights. For instance, in a March 5, 2015 filing submitted in federal court in response to a motion to dismiss, EMCF stated that it was "not challenging BCBS's right to pay 'non-emergency' services provided in the emergency department of a hospital at a flat rate of $50.00." We no doubt recognize that this apparent concession perhaps rightfully generated some confusion, but a less selective review of the record reveals that EMCF is challenging the existence of a law providing for the $50.00 cap. Indeed, both before and after the statement made in its March 5, 2015 filing, EMCF made other arguments clearly challenging the existence of a valid state law that would provide for the $50.00 cap. For example, from a pleading perspective, EMCF referenced a "purported" change in state law in its January 7, 2015 amended complaint, and in a May 2016 response filed in federal court, EMCF charged the Defendants as having set forth a "strained position that some mixture of budget appropriations, budget proposals, contingent appropriations, and legislative intent come together to make a 'state law' that automatically amended the uniform provider agreements." As EMCF explained in its brief on appeal, "[b]ecause discovery taken in this case after the Motion to Dismiss was decided revealed a significant question of fact as to whether the $50 fee cap was a law, it remains a hotly disputed issue."

As to EMCF's second argument that the trial court impermissibly decided a merits issue by dealing with the question of the law's existence, we disagree with EMCF's contention that inquiry into the existence of the law is not a potentially relevant consideration. For the reasons already discussed, the proof necessary to establish liability for a subset of the proposed class claims would be individualized depending on whether a law incorporating a $50.00 cap exists. When a question bears on predominance, it matters not that it overlaps with the merits. *See Bloodworth*, 2007 WL 1966022, at *21-22. Here, however, although we do not regard the existence of the disputed law to be conceded by EMCF, we do not find it necessary to remand the case for a preliminary inquiry into that question for purposes of a certification ruling. We say that because, irrespective of whether common issues may or may not predominate in a certain subset of the class claims, the proposed class as a whole cannot be certified. There are too many separate issues among the claims. First, as already noted, even if certain earlier claims might not be governed by a cap provision, there are "later" claims which are potentially subject to the cap contractually through the amendment of the BlueCare Provider Administration Manual. Because individualized proof would be required to determine whether the application of $50.00 payments to these later claims constituted breaches, it is clear that creating subclasses to account for different contractual standards among the claims would ultimately be to no avail. There is, for instance, no predominance of common issues among the claims that are governed by a $50.00 cap provision.

In addition, we take heed of the trial court's determination that a predominance of common issues was precluded based on the affirmative defenses of waiver and estoppel.

When the Defendants raised these defenses with regard to EMCF in their answer to the amended complaint, they argued that there could be no recovery based on EMCF's failure to act despite the changes in payment. Concerning the waiver defense, for example, the Defendants pled that "Plaintiff has waived any opportunity to seek additional reimbursement by its failure to act following receipt of notices of reimbursement changes in May 2011, June 2011, December 2011, June 2012, and January 2013." Moreover, in their brief, the Defendants argue generally that there are providers who continued to accept the benefits of their contracts after learning of the changes in payment through written notices or through the amendment of the BlueCare Provider Administration Manual. In the past, this Court has recognized that the resolution of a waiver defense can necessitate individualized proof. When affirming a trial court's refusal to certify a class in *Crouch v. Bridge Terminal Transport, Inc.*, No. M2001-00789-COA-R3-CV, 2002 WL 772998 (Tenn. Ct. App. Apr. 30, 2002), this Court specifically noted as follows:

> Under Tennessee law . . . a party may waive his or her known rights under a contract by either express declarations or by acts manifesting an intent not to claim the rights. *Tenn. Asphalt Co. v. Purcell Enter.,* 631 S.W.2d 439, 444 (Tenn. Ct. App. 1982) (citing *Dallas Glass, etc. v. Bituminous F. & M. Ins.,* 544 S.W.2d 351 (Tenn.1976)). Whether by declaration or by acts, however, the waiver must be intentional. *Hill v. Goodwin,* 722 S.W.2d 668, 671 (Tenn. Ct. App. 1986) (citing *Baird v. Fidelity-Phenix Fire Ins. Co.,* 178 Tenn. 653, 162 S.W.2d 384 (Tenn.1942)). Although the *American Jurisprudence* section relied upon by Plaintiffs does not presume a waiver in the event of continued performance after a material breach, Tennessee law nevertheless recognizes that rights under a contract may be waived under certain circumstances. While we make no determination of whether Plaintiffs indeed waived their rights, our inquiry into the law reveals that the trial court did have a legal basis in ruling that individual hearings could be required for the proposed class members with regard to the breach of contract claim. Accordingly, we hold that the trial court did not abuse its discretion in this respect.

*Id.* at *4.

In summary, given the different contractual terms governing the claims of the proposed class (whether it be the different terms relating to TennCare *Select* claims or the potential differences relating to certain TennCare claims), the fact that the claims of one subset of the class would necessarily require individualized proof to establish liability, and the presence of questions of waiver that are apt to require individualized hearings, we hold that the trial court did not err in finding that the predominance requirement was not established in this case. It therefore follows that the refusal to certify the proposed class was appropriate.

*Superiority*

In addition to challenging the trial court's predominance analysis, EMCF argues that the trial court abused its discretion by finding that a class action proceeding is not a superior mechanism to resolve this dispute. According to EMCF, the trial court departed from controlling legal standards in its consideration of superiority and "turned to a list of concerns plucked seemingly out of thin air." We need not inquire into this matter given our foregoing discussion on predominance, as certification under Rule 23.02(3) requires the establishment of both predominance and superiority. *See* Tenn. R. Civ. P. 23.02(3) (providing for the maintenance of a class action if "the court finds that the question of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy"). Given that predominance is not met, the trial court's order denying certification should be affirmed. EMCF's concerns about the trial court's superiority analysis are therefore pretermitted.

## CONCLUSION

For the foregoing reasons, the trial court's order denying class certification of the proposed class is hereby affirmed.

_____
ARNOLD B. GOLDIN, JUDGE